**In the Matter of DELTA MOLDED PRODUCTS, INC., Debtor in Possession.**

**IMPROVED MACHINERY, INC., Plaintiff,**

**v.**

**DELTA MOLDED PRODUCTS, INC., Defendant.**

**Civ. A. No. 75–A–815–S and Bankruptcy No. 74–1153.**

United States District Court,
N. D. Alabama, S. D.

June 22, 1976.

Douglas P. Corretti, Corretti, Newsom & Rogers, George I. Case, Jr., Birmingham, Ala., for plaintiff; Bruce H. Jackson, J. P. Janetatos, Baker & McKenzie, Washington, D. C., of counsel.

Charles Cleveland, Gordon, Cleveland & Gordon, Wilbur G. Silberman, Silberman, Silberman & Loeb, Rodney A. Max, Ben Zarzaur, Denaburg, Schoel, Meyerson & Ogle, Birmingham, Ala., for defendant (Debtor in possession).

## IN PROCEEDINGS FOR AN ARRANGEMENT UNDER CHAPTER XI.

### OPINION AND ORDER

ALLGOOD, Senior District Judge.

This matter is before the court on appeal from a decision of the Bankruptcy Judge of this court, denying the right of appellant, Ingersoll Rand Company, successor in interest to Improved Machinery, Inc. (hereinafter referred to as IMPCO), to enforce its contracts with appellee, Delta Molded Products, Inc., (hereinafter referred to as DELTA).

DELTA filed a petition for an arrangement under Chapter XI of the Bankruptcy Act on March 20, 1974, in the United States District Court for the Northern District of Alabama, case No. 74–1153. The petition was referred to the Honorable Stephen B. Coleman, Bankruptcy Judge, who entered an order on March 20, 1974, permitting the business to continue operations with DELTA as Debtor in Possession.

On May 1, 1974, IMPCO filed a reclamation petition, seeking recovery from DELTA of eight plastic molding machines and certain auxiliary equipment. Answers were filed by three general creditors and by DELTA as Debtor in Possession. The answers plead the general issue and other specific defenses, including the contention that the contracts relied upon by IMPCO were void and in violation of the constitutional and statutory provisions of Alabama law requiring IMPCO to be qualified to do business in Alabama.

The very able and experienced Bankruptcy Judge set the matter down for hearing on July 23, 1974. Seven witnesses testified on July 23, 1974, September 5, 1974, and on October 11, 1974. This testimony is recorded on approximately 350 pages in the transcripts. Numerous exhibits and documentary evidence were introduced in evidence.

On June 4, 1975, the Bankruptcy Judge entered an order denying IMPCO the relief it had requested in its complaint, finding that the contracts on which IMPCO's claims were based were void and in violation of the Constitution of Alabama, Article XII, Sec. 232; Code of Alabama, Title 10, Sec. 21(89); and Code of Alabama, Title 51, Section 342. The Bankruptcy Judge also determined that one of IMPCO's security agreements was invalid as to the Debtor in Possession because of an erroneous description of the machine and that one machine had been sold to DELTA as a straight sale without security.

In his very comprehensive and detailed findings of fact, the Bankruptcy Judge found that IMPCO had never qualified to do business in Alabama, that its initial contract with DELTA was made in Alabama, and that its "activities went beyond the point of sale of goods in interstate commerce and reached the point of intrastate and local commerce."

This court has reviewed the entire record in this cause and has had the benefit of extensive briefs in addition to those submitted to the Bankruptcy Judge and has reached the conclusion that the order of June 4, 1975, denying the relief sought by IMPCO in its reclamation petition and related motions should be reversed in part and affirmed in part. These conclusions have been formed bearing in mind the requirements of Bankruptcy Rule 810 that the findings of the Bankruptcy Judge must be affirmed unless the reviewing court finds them to be clearly erroneous and the Bankruptcy Judge must have applied proper legal standards in reaching the conclusions drawn.

### TRANSACTIONS BETWEEN DELTA & IMPCO

On January 4, 1972, representatives of IMPCO met with DELTA representatives at DELTA's office in Talladega, Alabama. As a result of this meeting, an agreement was drawn up whereby IMPCO agreed to sell to DELTA certain molding machines and auxiliary equipment. The contract was executed and promissory notes were signed for the portion of the price to be financed. The parties are in dispute as to the place the contract was entered into. (DELTA says Alabama; IMPCO says New Hampshire.) The Bankruptcy Judge determined that it was entered into in Alabama. There is evidence of a not insubstantial nature which shows the agreement signed in Alabama was not subject to approval by anyone from IMPCO other than those who signed the agreement in Alabama. A review of this evidence convinces this court that while the decision of the Bankruptcy Judge to the effect that the contracts involved were, in fact, Alabama contracts, is open to argument, the finding is not "clearly erroneous" and, therefore, should be affirmed.

On February 16, 1972, two of the machines (C 4168, C 4169) contracted for were shipped to DELTA at its expense. A security agreement describing these two machines was dated February 2, 1972. It was signed by Mr. Smith of IMPCO in New Hampshire and by Mr. Van Tassell of DELTA in Alabama apparently on the same day, February 2, 1972. A financing statement describing the two machines was filed with the Secretary of State on February 18, 1972.

IMPCO employed the First National Bank of Anniston, Alabama, to collect the monthly installments due under the promissory note.

The other two machines were shipped on March 9, 1972, to DELTA. In July, 1972, IMPCO sold one of the machines to an Ohio company, delivery to be taken at DELTA's plant. After adjusting the financing, DELTA was given $2,166.50 credit toward the purchase of another machine. A financing statement having previously been filed, a new security agreement was executed to refinance the balance remaining.

With two exceptions, which will be discussed herein, the remaining machinery purchased by DELTA from IMPCO followed the same pattern. For machines C 4191, C 4405, and C 4471, security agreements were executed and financing state-

ments were filed in the Secretary of State's office. Pretermitting the question as to non-qualification, the security agreements and financing statements were all properly prepared and met the Code requirements.

On September 12, 1972, another machine was shipped to DELTA. When the machine was manufactured, it was assigned the serial number C 4239 by IMPCO. Thereafter, IMPCO re-assigned the machine the number C 4424; however, the new number was never affixed. The shipping invoice, the security agreement and financing statement all show the serial number as C 4424. There is no invoice, security agreement or financing statement for C 4239.

■ The Bankruptcy Judge found that the security agreement and financing statements describing the machine by serial number C 4424 did "not sufficiently describe the machine in DELTA's possession identified by serial number C 4239, and [are] invalid as to the Debtor-in-Possession." (Par. # 23). This conclusion is clearly erroneous since it is contrary to the "fair notice filing" system envisioned by the Legislature when it passed the Uniform Commercial Code. (Tit. 7A, Code of Alabama). Section 9–402[1] discusses the formal requisites of a financing statement. The description of collateral called for is governed by Section 9–110.[2] The Official Comment sets forth the standard by which the sufficiency of the description is to be judged.

"The test of sufficiency of a description laid down by this Section is that the description do the job assigned to it—that it make possible the identification of the thing described. *Under this rule courts should refuse to follow the holdings, often found in the older chattel mortgage cases, that the descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test.*"

The cases and treatise writers are in complete agreement that in determining the sufficiency of a description notice filing contemplates "merely that the secured party who has filed may have a security interest in the collateral" and that further inquiry is necessary to disclose the complete state of affairs. *United States v. Big Z Warehouse,* 311 F.Supp. 283, 285 (S.D.Ga. 1970); 4 Anderson's Uniform Commercial Code, 2d Ed. Sec. 9–110:8. Chief Judge Lawrence analyzed the description required and concluded simply, "that the description in the security instrument must raise a warning flag, as it were, providing a key to the identity of the property." *U. S. v. Big Z Warehouse, supra,* at 286.

Here, the financing statement gave much more information than simply the serial number. The complete listing shows model number, type of machine, factory modifications thereon, and a thorough listing of auxiliary equipment attached thereto.[3] The correctness of the additional description is

---

**1.** "(1) A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral. A financing statement may be filed before a security agreement is made or a security interest otherwise attaches. When the financing statement covers crops growing or to be grown or goods which are or are to become fixtures, or timber, the statement must also contain a description of the real estate concerned and the name of the record owner thereof. A copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by both parties.

* * * * * *

"(5) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

**2.** "For the purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

**3.** One (1) IMPCO Model HCB1200–R 340 Injection Molding Machine, with Core Pull Circuit and Wedgmounts, Serial No. C–4424, and Auxiliary Equipment: 1–2024MB Nelmor 20 × 24 Grinder, 2–Capitol Temp. Units OMWH–9020, and 1–Hopper Loader Thorson McCosh 24B.

not disputed. "The fact that the description contains an incorrect serial number is not material if the description is otherwise sufficient to identify the property or give a key to its identity. [In fact] There is *no* requirement that the description set forth a serial number." 4 Anderson's Uniform Commercial Code Sec. 9–110:18 and cases cited therein. The Bankruptcy Judge's conclusion on this point was "clearly erroneous." The cases cited by DELTA in its brief are clearly distinguishable as they dealt with goods of a generally fungible nature whose primary differing characteristics were their different serial numbers. This is certainly not the case here.

### LEASE AGREEMENT

On October 24, 1972, IMPCO proposed to sell a model 700 R 135 molding machine and certain auxiliary equipment to DELTA for a specified amount, terms to be arranged. The proposal was accepted by DELTA on October 27, 1972, and approved by IMPCO on December 5, 1972. On November 28, 1972, IMPCO offered terms on a model 700 R 135 machine, serial number C 4555. The proposal called for DELTA to rent the machine for one year with an option to renew for an additional year or an option to purchase. On November 27, 1972, a two-page document entitled "Rental conditions" was executed for DELTA by Mr. Van Tassell as President. The document was approved by IMPCO on December 5, 1972, by Joseph J. Tata, the Manager of Sales Engineering of IMPCO's Plastic Machinery Division. It does not describe any machines or refer to any terms of payment. A financing statement on the C 4555 molding machine and auxiliary equipment was filed on January 16, 1973. The Bankruptcy Judge determined, however, that "None of the documents relative to C 4555 are a security agreement," and therefore the transaction constituted an unsecured sale of the machines from IMPCO to DELTA.

█ Since in a Chapter XI arrangement the Debtor-in-Possession has the rights of a trustee (Sec. 342) the party seeking reclamation of his property must show a superior right of possession than that exercisable by the Trustee. *National Silver Co. v. Nicholas*, 205 F.2d 52 (5th Cir. 1953). The Bankruptcy Judge determined that the lack of a security agreement denied IMPCO the superior status required. Since there was no valid security agreement, this portion of the Bankruptcy Judge's order should be affirmed.

Section 9–203 of the Uniform Commercial Code sets the criteria for the enforcement of a security interest.

"  .   .   . [A] security interest is not enforceable against the debtor or third parties unless (a) the collateral is in the possession of the secured party; or (b) the debtor has signed a security agreement *which contains a description of the collateral.*" (Emphasis added.)

The Official Comment to this section points out that these formal requisites are in the nature of a statute of frauds.

"Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies subsection (1)(b), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like .   .   . More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing." Comment 5, Sec. 9–203.

█ IMPCO, in its brief, admits the only relevant document executed by the parties sets forth merely terms and conditions of the rental. A copy of this agreement is attached hereto as Exhibit "A". IMPCO, however, would have the court overlook the 9–203 requirements by falling back to a "usage of trade/course of dealing" as allowed by the Code in its general definition of "Agreement." Sec. 1–201(3). While IMPCO may have an "agreement" within the 1–201(3) definition, the security agreement is not enforceable as it fails to describe the collateral in the signed writing. Section 9–203 being in the nature of a statute of frauds, parol evidence is not admissible to establish the statutory require-

ments. *In re Motrak Corp.,* 5 U.C.C.Rpt. Serv. 659 (D.Minn., Bankruptcy, 1967). Although IMPCO did file a financing statement with the Secretary of State, this form is not sufficient to establish an enforceable security agreement. *In re Vaillancourt,* 7 U.C.C.Rpt.Serv. 748 (N.D.Maine, Bankruptcy, 1970).

Therefore, the Bankruptcy Judge's decision is not "clearly erroneous." IMPCO has the status of an unsecured creditor as to machine C 4555 and its reclamation petition as to this item was properly denied.

## IMPCO'S INABILITY TO ENFORCE ITS CONTRACTS—APPLICABILITY OF THE NON–QUALIFICATION STATUTES

The Bankruptcy Judge found that the activities of IMPCO in the State of Alabama in the year 1972 were of such a substantial degree that IMPCO was "doing business" within the State. Since it is undenied that IMPCO was not qualified to do business within Alabama, the Bankruptcy Judge determined that IMPCO could not "petition to foreclose or otherwise enforce its contracts." [Opinion of Judge Coleman, p. 12].

IMPCO strenuously argues that its activities within the State were purely pursuant to the transaction of interstate commerce and, therefore, exempt from the operation of the statute. They further argue that the Bankruptcy Judge incorrectly took into account the non-Delta Molded transactions in determining the applicability of the qualification statutes. Assuming, however, that these determinations were correct, IMPCO asks the Court to allow enforcement of the contracts on the basis of the equity jurisdiction of the Court as provided in the qualification statutes.

DELTA persists in the argument adopted by the Bankruptcy Judge that the activities of IMPCO were intrastate in character and, therefore, IMPCO cannot now seek to enforce a contract which the statute allows DELTA to consider void.

The court does not believe that the combined activities of IMPCO place this company in the position of operating in intrastate commerce, including the activities of the two employees who worked in the paper mill division of this company.

The contracts between DELTA and IMPCO were for the purchase of highly complex machinery used in the plastics industry. The machines were manufactured by IMPCO in New Hampshire and were sold and shipped to DELTA in Alabama. Taken alone, this is admitted by all parties to be pure interstate commerce.

As a necessary adjunct to the basic contract, IMPCO furnished experts to come into Alabama and assemble the machines, put them in operation, train DELTA employees in the operation thereof, perform warranty maintenance and repairs as well as ordinary maintenance and repairs. These activities are totally essential to the basic contract but are only incidental thereto and do not constitute intrastate commerce. It must be remembered that the machines involved here are highly sophisticated complex machines designed and intended to be used for a specific purpose and that only specially trained highly qualified experts were capable of working on them. The record discloses that there were no persons to be found in Alabama with the required expertise to perform this work. The agreement by IMPCO to perform this assembly, start-up, maintenance and repair work was totally essential to the accomplishment of the interstate transaction (the sale and purchase of the machines) agreed to by IMPCO and DELTA; and without such an agreement, DELTA could not within reason have purchased the machines. With no other source of obtaining such essential services, no sale would have been made by IMPCO. Therefore, it is the opinion of this court that the performing of these services does not constitute intrastate commerce, but is merely incidental to the basic interstate transactions, although essential thereto. It is not a separate distinct undertaking by IMPCO, but merely a part of the interstate agreement.

The case of *Houston Canning Company v. Virginia Can Company*, 211 Ala. 232, 100 So. 104 (1924), confirms the fact that performance of services incidental to interstate contracts does not transform them into intrastate contracts subject to the statute. *Houston Canning* involved the lease of a can closing machine. The lease contract provided in part:

"Where it is necessary for further adjustment by lessor, it will furnish a mechanic and give all necessary instructions for proper operation."

The Alabama Supreme Court held that the maintenance provision was not sufficient to constitute doing business "intrastate." Speaking through Justice Miller, the Court said:

"It does not appear that the lessor keeps a mechanic in this state for that purpose; nor does the bill state that its mechanic gave such instruction or adjusted the machines in this state. This was an incident of the leasing and an inducement for the lessee to enter into the contract, and does not destroy its character as a single act of interstate commerce."

In this case the agreement to perform the services by IMPCO was a prime inducement for the signing of the contract. This activity did not destroy the interstate character of the contract. See also, *Mergenthaler Co. v. Hays*, 118 S.W. 1183 (Mo.Ct.Appeals 1916).

The activities of the two IMPCO employees who worked in the paper mill division of the company rather than the plastics division are no different from activities of those in the plastics division. The record shows that they are engaged in performing essential but incidental services to purchasers of highly complex paper mill machinery and that their services are adjuncts to interstate transactions. In the business of manufacturing and selling highly intricate, complex and very expensive machinery, the court recognizes that it is an absolute necessity for the manufacturer to provide expert assembly, start-up, repair and maintenance personnel to purchasers. Such services can-not be found available in the open market place and must be provided by the manufacturer (seller). The activities of the paper mill division employees are a part of the interstate commerce involved in the manufacture and sale of paper mill machinery.

The use of an Alabama bank to collect payments from DELTA which were due to IMPCO is a normal and customary procedure followed by many companies doing business in interstate commerce and in no way changes the nature of the total transaction and would not in itself justify holding that IMPCO was in the performance of the contracts in question operating in intrastate commerce in the State of Alabama.

This case is distinguishable from the recent Fifth Circuit case of *Sar Manufacturing Company, Inc. v. Dumas Bros. Mfg. Co. Inc.*, 526 F.2d 1283 (5 Cir. 1976). There the Fifth Circuit prevented the plaintiff from enforcing a promissory note in the State of Alabama because of the failure of the foreign corporation to comply with the Alabama qualification statutes. The Fifth Circuit pointed to the "localized" activity of the foreign corporation in denying enforcement of the contract.

"[T]he plaintiff leased a warehouse in Jackson, Alabama which was used to receive and store the polyurethane foam for sale to Dumas Brothers and some processing of the foam was done at the warehouse. The plaintiff employed seven full or part-time employees at the warehouse and maintained two vehicles at the warehouse on a full-time basis.

\*     \*     \*     \*     \*     \*

"[T]he marketing and supply functions of the plaintiff are localized enough to easily fall under the ambit of a series of transactions which are primarily interstate and concomitantly the corporation falls under the satrapy of the qualification statutes." 526 F.2d at 1284, 1286.

In this case, the activities of IMPCO were not localized in Alabama with the exception of the maintenance provisions which was merely incidental to the interstate contract. The facts of this case show that there did

not exist the sufficient nexus between the localized activity and the interstate contract to allow a finding that IMPCO was doing business in Alabama within the ambit of the qualification statute.

In addition to the above listed grounds, there is another reason why a portion of the Bankruptcy Judge's order should be reversed. The Alabama courts have held that the non-qualification statute is penal in nature and, therefore, is to be strictly construed. They have held that the statute does not apply to the exercise of proprietary interests in property. Since a reclamation petition is by its very nature a petition to reclaim the possession of property being wrongfully held by another, the action is substantially similar to an action in conversion, and recovery should be allowed. *Jones v. Americar, Inc.,* 283 Ala. 638, at 643, 219 So.2d 893 (1969).

In the *Jones* case, Americar, Inc., a Florida corporation, and Jones entered into an agreement whereby Jones was granted the right to operate automobile rent-a-car agencies in the State of Alabama using automobiles leased to Jones by Americar. After several months the parties got into a controversy, each charging the other with failing to live up to certain of the terms in the agreement. Finally Jones cancelled the contract and Americar brought an action in conversion for the return of its automobiles. On appeal to the Alabama Supreme Court, Americar argued that despite its failure to comply with State law regarding qualification, it was not precluded from maintaining an action to recover possession of property when the action does not require enforcement of the contract. Jones argued that when the tort (conversion) "arises out of a contract that is void because a foreign corporation has not complied with the qualification law * * * then that corporation likewise should not be accorded the right and privilege of suing on a tort claim that is necessarily granted in the contract." 283 Ala. at 643, 219 So.2d at 896.

The State Supreme Court held that Americar could maintain its action in conversion despite its non-qualification. "We think that which is prohibited in the Alabama statutes are suits on contracts by unqualified corporations. * * * And, as stated in the Kentucky case of *Sayers & Muir Service Station v. Indian Refining Co., supra* [266 Ky. 799, 100 S.W.2d 687]:

' * * * [T]he statute being penal in its nature and in derogation of the common law it should not be construed so as to include within its purview cases which do not clearly come within it. * * * ' "

In a case decided in the same year as the *Jones* case, the Supreme Court again pointed to the "enforcement of property rights" exception to the qualification statutes. In *Calvert Iron Works v. Algernon Blair, Inc.,* 284 Ala. 655, 227 So.2d 424 (1969), the plaintiff, a non-qualified foreign corporation contracted with the defendant to do certain construction work and provide materials in connection with the seating additions to Denny Stadium. The plaintiff brought suit for breach of contract when the defendant refused to pay a portion due thereunder. The Alabama Supreme Court refused to allow the non-qualified corporation to enforce its contract. However, the Court went on to say:

"It has been held that when a contract has been fully executed by the parties, resulting *property* rights are enforceable in the courts of this state by *possessory* action, not withstanding the original invalidity of the contract by reason of the plaintiff's non-compliance with the statutes of the State of Alabama. *Capitol Lumber v. Mullinax,* 208 Ala. 266, 94 So. 88. However, the plaintiff in this case is not seeking to enforce a property right by a possessory action." 227 So.2d at 426.

In the more recent case of *Jones v. Kendrick Realty Co.,* 287 Ala. 402, 252 So.2d 61 (1971), a non-qualified Georgia corporation sought a temporary injunction restraining persons from trespassing onto land in Russell County, Alabama, it had recently contracted for and purchased. Justice Coleman found a distinction between enforcement of a contract and a suit to protect property rights and allowed the injunction to stand.

"Section 232, Constitution 1901, and the statutes relied on by respondent do not expressly declare that a non-complying foreign corporation cannot maintain a suit to protect its property in this state. The instant suit is a suit to protect complainant's property rights, it is not a suit to enforce a mortgage or other contract." At 406, 252 So.2d at 64.

In the case of *Capitol Lumber Company v. Mullinax*, 208 Ala. 266, 94 So. 88 (1922), the Court was faced with the situation where a non-qualified foreign corporation entered into a contract with the defendant who owned and operated a saw mill. After the lumber was cut, it was piled into stacks and bills of sale were sent to the plaintiff. The plaintiff paid the amount due under the contract and the lumber was never delivered. Plaintiff brought suit to obtain its property and the defendant claimed that the contract was void for failure to qualify. Justice Somerville concluded:

"The rule is well and soundly established that, when a contract has been fully executed by the parties, resulting property rights are enforceable in the courts by possessory actions notwithstanding the original invalidity of the contract by reason of the plaintiff corporation's non-compliance with the statutory requirements. (Citations omitted) At 268, 94 So. at 90.

\*      \*      \*      \*      \*      \*

This action is in no sense an attempt to enforce any provision or provisions of an executory contract, but merely to enforce possessory rights which have been created and which now exist by the voluntary acts of the parties; and now having fully performed his own obligations and accepted performance also on the part of the plaintiff, it is too late to raise the question of the original invalidity of the contract under which they had proceeded."

It should be pointed out that the majority of cases wherein property rights can be enforced despite the failure to qualify deal with cases involving non-executory contracts. In fact, the Alabama court in *Mulli-*

*nax* held that the intra-interstate commerce distinction was "wholly immaterial" in the case of executed contracts. Since there is no doubt that the contract in this case is fully executory the purchase price having not been paid, there is some room for argument that the possessory action exception to qualification might not apply in this case. However, since the courts have held that actions in conversion, detinue, ejectment, trespassing, and replevin are allowable despite qualifications, and since the reclamation petition is in the nature of a replevin/conversion action, the court would be on sound footing to base its decision on the possessory action exception.

"A reclamation proceeding has been likened to an action in replevin, and it has been said that the petition should contain allegations sufficient to sustain such an action, or at least a complaint for conversion." 4A Collier on Bankruptcy, ¶ 70.-39[2].

Although there is contrary authority, perhaps the closest case to this one was decided by the Alabama Supreme Court in 1890. In *Boulden v. Estey Organ Company*, 92 Ala. 182, 9 So. 283 (1890), the non-qualified foreign corporation brought suit to recover a piano sold under a conditional sales contract. The Court assumed that the contract was void under the statute but went further to discuss the effect of the statute on the proper rights of the parties.

"The foreign corporation entered into an executory agreement to sell the piano, but the agreement did not ripen into an executed contract of sale. The title remained with the Estey Organ Company. If the promise to pay for the piano had been violative of no constitutional, or statutory prohibition, the purchaser could not have acquired the right and title to the piano, without paying the agreed purchase price. What is the effect? Certainly not to vest title in the purchaser, without performing the condition on which his title was made to depend. To so hold, would be to make a contract for the parties which they never agreed to make, and to convert the transaction into

an absolute sale, when the contracting parties agreed to make, and did make it only a conditional agreement to sell; and this, notwithstanding the non-performance of the condition stands out as an undisputed fact. Conceding that all the executory terms of the agreement of sale were opposed alike to the Constitution and to the statute, and therefore not enforceable, the title to the piano remained in the Estey Organ Company, unaffected by the illegal, unexecuted attempt to sell it. *An executory agreement to make a sale which the law forbids to be made, cannot, at one and the same time be invalid to bind the purchaser to the performance of the agreed condition precedent to the vesting of title in him, and yet valid to devest title out of the seller.*

\* \* \* \* \* \*

"Pretermitting all further discussion as to whether the plaintiff corporation is one that falls under the ban of the constitutional provision; or whether the enforcement of this constitutional and statutory regulation as to the contract here involved would contravene the power granted to Congress to regulate commerce among the States, *we hold that in either of these aspects of the case plaintiff is entitled to recover.*" *Boulden, supra,* 184, 185, 9 So. 283, 284. (Emphasis added.)

## CONCLUSION

This court is of the opinion that the Bankruptcy Judge should be reversed as to all machines sold to DELTA except machine No. C–4555. This is the machine on which there was originally an offer to sell, a subsequent discussion regarding a lease, a signed lease describing no machine and a recorded financing statement. Judge Coleman found this transaction to be an unsecured sale, and such a finding is supported by the evidence and should be affirmed. IMPCO should be allowed to recover on its complaint all of the property sued for, with the exception of machine No. C–4555.

Affirmed in part; reversed in part and remanded so that the Bankruptcy Judge might issue the necessary orders in conformity with the above.