470 So.2d 1151 (1985)
WALLACE CONSTRUCTION CO., INC. and Hartford Accident & Indemnity Co., Inc.
v.
INDUSTRIAL BOILER CO., INC.
83-1232.
Supreme Court of Alabama.
March 22, 1985.
Rehearing Denied May 10, 1985.
John T. Robertson IV of Henslee and Bradley, Gadsden, for appellants.
Michael L. Roberts of Floyd, Keener & Cusimano, Gadsden, for appellee.
SHORES, Justice.
We granted permission for the defendants, Wallace Construction Company, Inc., and Hartford Accident and Indemnity Company, Inc., to appeal from the trial court's denial of their motion for summary judgment in this action brought by Industrial Boiler Company, Inc., to recover damages for breach of contract. We affirm.
Industrial Boiler Company, Inc. (Industrial Boiler), a Georgia corporation, filed suit against Wallace Construction Company, Inc. (Wallace), and Hartford Accident and Indemnity Company, Inc. (Hartford), seeking damages for breach of contract. Wallace was the successful bidder for a contract with the University of Montevallo for, among other things, the installation of a heating system at the school. Hartford *1152 was the surety on Wallace's bond for that project. By virtue of a subcontract with Wallace, dated August 18, 1981, Industrial Boiler agreed to manufacture and install the boiler system. This it did. On June 16, 1983, Industrial Boiler filed a complaint, naming Wallace and Hartford as defendants, alleging Wallace's failure to pay under this contract and Hartford's liability thereon as surety.
Wallace and Hartford contend that Industrial Boiler's activities concerning the assembly and installation of the boiler constituted doing business in Alabama. They further argue that Industrial Boiler failed to qualify to do business in Alabama until after the execution of the contract in question and that it is, therefore, precluded, as a matter of law, from enforcing the contract under § 10-2A-247 and § 40-14-4, Ala.Code 1975, and Article XII, § 232, of the Alabama Constitution of 1901.
Industrial Boiler does not dispute its failure to timely qualify to do business in Alabama, but insists that its activities within Alabama were necessary and incidental to the interstate sale of the boiler and, therefore, did not constitute "doing business" within the meaning of the provisions relied upon by Wallace and Hartford. We agree.
Section 232 of the Alabama Constitution, § 10-2A-247, and § 40-14-4, supra, bar a foreign corporation not qualified to do business in Alabama from enforcing its contracts in the courts of this state. These laws apply, however, only when the business conducted in this state by the non-qualified corporation is intrastate in nature. Johnson v. MPL Leasing Corp., 441 So.2d 904 (Ala.1983). A non-qualified foreign corporation is not barred from enforcing its contracts in Alabama when its activities within this state are incidental to the transaction of interstate business. Johnson v. MPL Leasing Corp.; Cobb v. York Ice Mach. Corp., 230 Ala. 95, 159 So. 811 (1935); York Mfg. Co. v. Colley, 247 U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963 (1918); Article I, § 8, cl. 3, United States Constitution.
Summary judgment is proper where there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. Rule 56(c), A.R. Civ.P. The undisputed facts in this case show that Industrial Boiler contracted with Wallace on August 18, 1981, to manufacture and install a wood fuel boiler system, but failed to qualify to do business in Alabama until September 13, 1982. The boiler was manufactured by Industrial Boiler in Georgia and shipped to the jobsite in 300 to 400 separate parts, where Industrial Boiler personnel assembled and installed it. Assembled, the boiler was approximately 40 feet wide, 60 feet long, and 25 feet high. The number of full-time Industrial Boiler personnel on the jobsite varied from time to time and included one to five employees who were skilled in the assembly and installation of boilers. When required, these employees stayed overnight at local motels. Industrial Boiler also hired three to five local residents to perform temporary manual labor. Industrial Boiler never maintained an office on the jobsite and had no telephone, gas, water, or electrical service connected. Industrial Boiler contracted with a local crane service for the use of a crane and operator and also leased a forklift and a portable air compressor. When necessary, Industrial Boiler personnel purchased certain parts from local merchants. The boiler was installed within a building built especially for that purpose and consisted of a steel structure resting on a concrete foundation. Industrial Boiler did not build any part of this building and did no work on the jobsite other than the assembly and installation of the boiler. The assembly and installation of the boiler was not within the capability of most general contractors, including Wallace, but required skilled personnel with a background in boiler machinery. Industrial Boiler makes installation services available to its purchasers, who usually desire it, and while it has certain competitors capable of providing these services, Industrial Boiler was awarded the contract with Wallace on the basis of its low bid. The assembly and installation of the boiler was to be completed within 250 days, but took approximately *1153 45 days longer. The contract also required Industrial Boiler to provide 5 days of adjustment, start up, and training upon completion of the installation.
In Puffer Mfg. Co. v. Kelly, 198 Ala. 131, 73 So. 403 (1916), the Court reversed the trial court's decision barring suit by a non-qualified foreign corporation which had sold and installed a soda fountain and appurtenances in Alabama. The Court wrote as follows:
"The question under consideration has been, in various forms, a frequent subject of decision in the American courts, and the consensus of judicial opinion is that the mere installation of machinery or other apparatus, including the assembly of its completed and adjusted parts, and its erection in its place for use is but an incident of the sale, and is not, in that connection an act of local business, if the sale and delivery is itself an act of interstate commerce....
"....
"It is clear that, although the general principles which have guided the courts in these various decisions may be easily stated, no inflexible rule can be prescribed for all cases, and each must be decided upon its own peculiar facts.
"(1) If there is a sale of a chattel, complete in the hands of the vendor, although it may, from convenience or necessity, be transported membris dijectis, an agreement to merely set it up ready for use in the vendee's place of business is upon its face but an incident of the sale, which ought not to destroy its character as a single and indivisible act of interstate commerce. This is especially true where the manufacturer of complex machinery or apparatus, the satisfactory operation of which must largely depend upon the nicety or perfection of its adjustments, agrees to deliver it in working order to the purchaser. Such an agreement is a valuable trade inducement, and is a reasonable and legitimate incident of the sale itself. But this conclusion may be defeated by various considerations, viz., by the character of the article as a permanent improvement to the freehold, by the nature and extent of the labor required for its adaptation and preparation for use, and the time and conditions under which it is turned over to the purchaser after its arrival.
"(2) Upon a very full consideration of the present case we are constrained to hold that plaintiff's agreement to install the soda fountain and its appurtenances in defendant's place of business at Montgomery was a reasonable incident of its sale, and with it constituted a single act of interstate commerce."
198 Ala. at 133, 135-136, 73 So. at 404-405.
In York Mfg. Co. v. Colley, supra, the United States Supreme Court directly addressed the commerce-clause implications of interstate sale and installation contracts. In that case, the non-qualified foreign corporation contracted to sell an ice plant consisting of various items of machinery which were shipped to Texas, where they were assembled, installed, and tested under the supervision of an engineer employed by the seller. The installation of the ice plant took approximately three weeks, and the testing took an additional week. After a demonstration of its successful operation, it was accepted by the purchasers. The Court held that the installation and testing of the ice plant did not constitute local commerce and stated:
"[S]ince the ruling in McCulloch v. Maryland, 4 Wheat. 316, [4 L.Ed. 579], there has been no doubt that the interstate commerce power embraced that which is relevant or reasonably appropriate to the power granted, so also from such doctrine there can be no doubt that the right to make an interstate commerce contract includes in its very terms the right to incorporate into such contract provisions which are relevant and appropriate to the contract made. The only possible question open therefore is, was the particular provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency *1154 before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is not appropriate to its sale. The consequence of such a ruling if made in this case would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of sale the ice plant purchasedmight come into existence....
"Of course we are concerned only with the case before us, that is, with a contract inherently relating to and intrinsically dealing with the thing sold, the machinery and all its parts constituting the ice plant. This view must be borne in mind in order to make it clear that what is here said does not concern the subject passed on in General Railway Signal Co. v. Virginia, 246 U.S. 500 [38 S.Ct. 360, 62 L.Ed. 854 (1918)], since in that case the work required to be done by the contract over and above its inherent and intrinsic relation to the subject-matter of the interstate commerce contract involved the performance of duties over which the state had a right to exercise control because of their inherent intrastate character. In fact, the case last referred to when looked at from a broad point of view is but an illustration of the principle applied in the Waycross Case [Browning v. Waycross, 233 U.S. 16, [34 S.Ct. 578, 58 L.Ed. 828] (1914)] to the effect that that which was inherently intrastate did not lose its essential nature because it formed part of an interstate commerce contract to which it had no necessary relation. And this truth by a negative pregnant states the obverse view that that which is intrinsically interstate and immediately and inherently connected with interstate commerce is entitled to the protection of the Constitution of the United States resulting from that relation." (Emphasis added.)
247 U.S. at 24-26, 38 S.Ct. at 431-432.
In the case of In re Delta Molded Products, Inc., 416 F.Supp. 938 (N.D.Ala.1976), affirmed, 571 F.2d 957 (5th Cir.1978), the district court, applying Alabama law, held that the non-qualified foreign corporation (IMPCO) was not barred from enforcing its contracts for the sale of complex machinery used in the plastics industry. The court, emphasizing the complex and sophisticated nature of the equipment and the expertise necessary in assembling the machinery, stated as follows:
"The court does not believe that the combined activities of IMPCO place this company in the position of operating in intrastate commerce, including the activities of the two employees who worked in the paper mill division of this company.
"The contracts between DELTA and IMPCO were for the purchase of highly complex machinery used in the plastics industry. The machines were manufactured by IMPCO in New Hampshire and were sold and shipped to DELTA in Alabama. Taken alone, this is admitted by all parties to be pure interstate commerce.
"As a necessary adjunct to the basic contract, IMPCO furnished experts to come into Alabama and assemble the machines, put them in operation, train DELTA employees in the operation thereof, perform warranty maintenance and repairs as well as ordinary maintenance and repairs. These activities are totally essential to the basic contract but are only incidental thereto and do not constitute intrastate commerce. It must be remembered that the machines involved here are highly sophisticated complex machines designed and intended to be used for a specific purpose and that only specially trained highly qualified experts were capable of working on them. The *1155 record discloses that there were no persons to be found in Alabama with the required expertise to perform this work. The agreement by IMPCO to perform this assembly, startup, maintenance and repair work was totally essential to the accomplishment of the interstate transaction (the sale and purchase of the machines) agreed to by IMPCO and DELTA; and without such an agreement, DELTA could not within reason have purchased the machines. With no other source of obtaining such essential services, no sale would have been made by IMPCO. Therefore, it is the opinion of this court that the performing of these services does not constitute intrastate commerce, but is merely incidental to the basic interstate transactions, although essential thereto. It is not a separate distinct undertaking by IMPCO, but merely a part of the interstate agreement.
"The case of Houston Canning Company v. Virginia Can Company, 211 Ala. 232, 100 So. 104 (1924), confirms the fact that performance of services incidental to interstate contracts does not transform them into intrastate contracts subject to the statute. Houston Canning involved the lease of a can closing machine. The lease contract provided in part:
"`Where it is necessary for further adjustment by lessor, it will furnish a mechanic and give all necessary instructions for proper operation.'
"The Alabama Supreme Court held that the maintenance provision was not sufficient to constitute doing business `intrastate.' Speaking through Justice Miller, the Court said:
"`It does not appear that the lessor keeps a mechanic in this state for that purpose; nor does the bill state that its mechanic gave such instruction or adjusted the machines in this state. This was an incident of the leasing and an inducement for the lessee to enter into the contract, and does not destroy its character as a single act of interstate commerce.'
In this case the agreement to perform the services by IMPCO was a prime inducement for the signing of the contract. This activity did not destroy the interstate character of the contract....
"The activities of the two IMPCO employees who worked in the paper mill division of the company rather than the plastics division are no different from activities of those in the plastics division. The record shows that they are engaged in performing essential but incidental services to purchasers of highly complex paper mill machinery and that their services are adjuncts to interstate transactions. In the business of manufacturing and selling highly intricate, complex and very expensive machinery, the court recognizes that it is an absolute necessity for the manufacturer to provide expert assembly, start-up, repair and maintenance personnel to purchasers. Such services cannot be found available in the open market place and must be provided by the manufacturer (seller). The activities of the paper mill division employees are a part of the interstate commerce involved in the manufacture and sale of paper mill machinery."
416 F.Supp. at 943-944.
Applying the law to the undisputed facts in this case, we hold that the combined local activities of Industrial Boiler in Alabama concerning the assembly and installation of the boiler did not constitute intrastate business, but were necessary and incidental to the interstate sale of the boiler itself. Industrial Boiler was able to provide assembly, installation, adjustment, start-up, and training in conjunction with the sale of the boiler and still remain the low bidder on the contract. Wallace, lacking the expertise required to assemble and install the boiler, contracted with Industrial Boiler for this service. Wallace and Hartford argue that the contract in question was for construction with the sale of the boiler incidental thereto. They erroneously rely upon a line of cases which stand for the proposition that activities inherently intrastate, such as construction, do not lose *1156 their essential nature because they form a part of an interstate commerce contract to which they have no necessary relation. That argument does not fit these facts. It is undisputed that Industrial Boiler did no work on the jobsite other than assemble and install the boiler. Furthermore, the contract was for the manufacture and sale of a complex piece of machinery, and the agreement to install it was not only a valuable trade inducement but a reasonable and appropriate incident of the sale itself. Therefore, Industrial Boiler is not barred from litigating its claims in the courts of this state, despite its failure to be qualified to do business here at the time of the transaction.
Accordingly, because Wallace and Hartford were not entitled to a judgment as a matter of law, summary judgment was properly denied.
The order appealed from is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES, ALMON, EMBRY and ADAMS, JJ., concur.
FAULKNER and BEATTY, JJ., dissent.
BEATTY, Justice (dissenting):
The case authority on which the majority relies for the proposition that the assembly and installation of the boiler system at the University of Montevallo were incident and necessary to the interstate sales contract is distinguishable on some important bases.
The first case the majority discusses is Puffer Manufacturing Co. v. Kelly, 198 Ala. 131, 73 So. 403 (1916). While the Court in Puffer concluded that the assembly and installation of a soda fountain was incident to the sale, the Court added:
"But this conclusion may be defeated by various considerations, viz., by the character of the article as a permanent improvement to the freehold, by the nature and extent of the labor required for its adaptation and preparation for use, and the time and conditions under which it is turned over to the purchaser after its arrival." 198 Ala. at 136, 73 So. at 405. When the considerations stated above are applied to the facts of this case, a result different from that in Puffer ought to be reached. Here, Industrial Boiler took approximately ten months to assemble and install the system at Montevallo. The system itself measured 40 feet wide, 60 feet long, and 25 feet high, and could hardly be regarded as anything but a permanent improvement or fixture. During the installation process, Industrial Boiler contracted with a local crane service and leased a forklift and a portable air compressor. It also hired three to five local residents to perform temporary manual labor. It is difficult to see how all of this was merely incident to the contract for the sale of the boiler.
Furthermore, the fact that Industrial Boiler's contracts with local merchants were "reasonable and incidental" to the performance of its contract with Wallace does not make Industrial Boiler's installment contract with Wallace any less intrastate in character. In fact, based on the considerations outlined in Puffer, supra, set out above, the necessity for such local contracts, as well as the length of time the assembly and installation required, and the permanent nature of the boiler system further support the conclusion that the contract was intrastate in character.
The majority also relies on and quotes extensively from York Manufacturing Co. v. Colley, 247 U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963 (1918). Given the common meaning of the terms "relevant" and "appropriate," I do not dispute that the contract for the assembly and installation of the boiler system was "relevant" and "appropriate" to its sale, especially in view of Industrial Boiler's low bid; however, being "relevant" and "appropriate" in an ordinary sense does not make the contract "necessary" and "incidental" to the sale, nor does it nullify the other considerations that point up the intrastate character of the contract and its performance. It seems to me that the following language taken from York Manufacturing Co., supra, which attaches a narrower definition of "relevant" *1157 and "appropriate" in the context of these cases, nevertheless indicates a recognition by that Court of the "necessity" that the manufacturer /seller perform the assembly and installation of the machinery and test its efficiency where the machinery is complex and assembly is required to be performed with the expertise it is assumed only the manufacturer/seller would have:
"The only possible question open therefore is, was the particular provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is not appropriate to its sale. The consequence of such a ruling if made in this case would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of salethe ice plant purchasedmight come into existence...." (Emphasis added.) 247 U.S. at 24-26, 38 S.Ct. at 432.
Thus, as I interpret this passage, it is the requirement that the contract for installation, etc., be necessary that makes it relevant and appropriate.
It is precisely this line of reasoning that was applied by the court in In re Delta Molded Products, Inc., 416 F.Supp. 938 (N.D. Ala.1976), affirmed, 571 F.2d 957 (5th Cir.1978), on which the majority relies. In Delta, the court emphasized the fact that, in that case, no one else in Alabama was available to assemble and install the machinery in question:
"These activities are totally essential to the basic contract but are only incidental thereto and do not constitute intrastate commerce.... The record discloses that there were no persons to be found in Alabama with the required expertise to perform this work. The agreement by IMPCO to perform this assembly, start-up, maintenance and repair work was totally essential to the accomplishment of the interstate transaction (the sale and purchase of the machines) agreed to by IMPCO and DELTA; and without such an agreement, DELTA could not within reason have purchased the machines. With no other source of obtaining such essential services, no sale would have been made by IMPCO. Therefore, it is the opinion of this court that the performing of these services does not constitute intrastate commerce, but is merely incidental to the basic interstate transactions, although essential thereto. It is not a separate distinct undertaking by IMPCO, but merely a part of the interstate agreement.

"....
"... Such services cannot be found available in the open market place and must be provided by the manufacturer (seller)." (Emphasis added.) 416 F.Supp. at 943-944.
These factors are not present here, nor is there an allegation that only Industrial Boiler possessed the required "mechanical skill and precision" necessary to make the boiler system operative. In fact, the contrary is true. In its opinion, the majority points out that Industrial Boiler "has certain competitors capable of providing these services," but that "Industrial Boiler was awarded the contract with Wallace on the basis of its low bid." (Emphasis added.) This hardly meets the "necessity" test set forth in In re Delta Molded Products, supra, and implied by the Court in York Manufacturing Co., supra. Moreover, it appears that the assembly and installation work was a "separate distinct undertaking" *1158 by Industrial Boiler, and not "merely a part of the interstate agreement."
The majority gives no other reasons to substantiate its conclusion that Industrial Boiler's assembly and installation services were "necessary and incidental to the interstate sale of the boiler [system]." In fact, there being others available to perform these services, Industrial Boiler's activities were not necessary nor merely incidental. Since the facts of this case do not fit the exceptions carved out by those authorities upon which the majority relies, I would hold that Industrial Boiler's assembly and installation contract, and the performance of it, were intrastate in character. Accordingly, Industrial Boiler should have qualified to do business in Alabama in order to enforce its contracts in the courts of this state. For these reasons, Wallace and Hartford's motion for summary judgment was improperly denied.
FAULKNER, J., concurs.