Community Care of America of Alabama, Inc., d/b/a IHS of Southgate f/k/a Southgate Village, a Delaware corporation, and two of its employees, Brenda White and Joan Tidwell (Community Care and its employees are hereinafter referred to collectively as "Community Care"), appeal from an order denying their motion to compel arbitration of this dispute. We affirm.
This dispute arises out of an action commenced by Leatha Davis, an Alabama resident, against Community Care. Davis alleged that Community Care of America of Alabama, Inc., owned and operated a "nursing home and long-term care facility" in Bessemer, to which she was admitted on January 24, 2000. Her complaint alleged that, while she resided in the nursing home, she developed "pressure ulcer sores on her feet," as the result of what she described as the "negligent and wanton conduct" of the defendants. She averred that, as a consequence of this condition and of Community Care's failure to provide "the proper medical services, care, and treatment that a long-term care facility within the same medical community, and same general line of practice, possessing and exercising such ordinary, reasonable and necessary medical care, skill and diligence would have provided" in discovering and treating the condition, she suffered the amputation of both legs. She sought compensatory and punitive damages.
Community Care moved to compel arbitration of the dispute, based on a clause in the "Admission Contract" Davis's son, Willie Harris, executed when Davis was admitted to the facility. It supported the motion with the affidavit of Tidwell, the administrator of the nursing-home facility.
The trial court refused to consider the affidavit, concluding that it was not based on Tidwell's personal knowledge. The trial court also denied the motion to compel arbitration. From that order, Community Care appealed.
On appeal, Community Care contends that the trial court erred in refusing to consider Tidwell's affidavit, which, it argues, demonstrates that the Admission Contract bears a nexus with interstate commerce sufficient to render the arbitration provision enforceable through the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA"). In particular, § 2 of the FAA provides:
 "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy *Page 285 
thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
(Emphasis added.)
Tidwell's affidavit stated, in pertinent part:
 "My name is Joan Tidwell. I am the Administrator for the IHS of Southgate facility in Bessemer. I have personal knowledge of the facts contained in this affidavit and I am authorized to give this affidavit. I understand that this affidavit will be used in support of a motion to compel arbitration.
 "Leatha Davis was admitted to Southgate on January 24, 2000. At the time of her admission, she was accompanied by her son, Willie Harris. Willie Harris acted as her agent for purposes of signing the necessary admissions contracts. Leatha Davis was not physically capable of signing the documents herself and, therefore, her son signed on her behalf. Leatha Davis never expressed any objection to her son serving as her fiduciary representative. This is common practice for admissions to our facility because the majority of our residents are not capable of signing the necessary contracts. Southgate regularly allows an immediate family member to serve as a fiduciary agent for the resident who is being admitted to the facility.
 "Southgate answers to a regional office in Florida and a corporate office in Maryland. Our monthly quality assurance reports are submitted for review in Florida and then are forwarded to Maryland for further review. These reports were prepared at the time Leatha Davis was a resident at Southgate.
 "Southgate has patients who are residents from other states. In addition, we receive regular shipments of supplies from other states, including Georgia, Wisconsin and Mississippi. The supplies that came from those states were ultimately used in the treatment and care of Leatha Davis. The treatment and care given to Leatha Davis would not have been possible without the shipments of supplies from Georgia, Wisconsin and Mississippi. Our medications were purchased from Pharmerica which is based in Florida and is a subsidiary of a California corporation. The medications purchased from Pharmerica are manufactured in and shipped from all parts of the country. . . . Her treatment and care would not have been possible but for the medications that are shipped in from out of state.
 "Leatha Davis was a Medicare Complete patient. To the best of my knowledge, Medicare Complete is an insurance program that receives funding from the federal Medicare program. Medicare Complete allows a 100-day benefit for care in a skilled nursing facility. If a patient is Medicaid eligible, then Medicaid pays for the services rendered after the expiration of the 100-day period. Southgate has received $24,555 from Medicare Complete for the treatment provided to Leatha Davis. In addition, Medicaid has paid $9,050.13 for the services provided to Leatha Davis. The treatment and care given to Leatha Davis would not have been possible without the funding provided by Medicare Complete and Medicaid."
The affidavit demonstrates a nexus with interstate commerce. However, we need not determine whether the trial court erred in striking the affidavit, because, *Page 286 
even assuming that it was admissible, it fails to compel the conclusion that the FAA requires enforcement of the arbitration provision.
"The purpose of the FAA was to reverse judicial hostility to arbitration agreements and to place arbitration agreements on equal footing with other contracts." Keymer v. Management Recruiters Int'l,Inc., 169 F.3d 501, 504 (8th Cir. 1999) (emphasis added); see EqualEmployment Opportunity Comm'n v. Waffle House, Inc., 534 U.S. 279, 294,122 S.Ct. 754, 764 (2002). Under the "savings clause" of § 2, "state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Perry v. Thomas, 482 U.S. 483,492 n. 9 (1987), quoted in Doctor's Assoc., Inc. v. Casarotto,517 U.S. 681, 685 (1996). Under some circumstances, therefore, Alabama law may prohibit the enforcement of an arbitration clause — even one in a contract evidencing a transaction that substantially affects interstate commerce.
It is undisputed that on November 6, 1999, the office of the Secretary of State revoked the certificate of authority of Community Care of America of Alabama, Inc., to transact business in Alabama. Thus, when the Admission Contract was signed, Community Care was not qualified to do business in Alabama, as required by Ala. Code 1975, §10-2B-15.01(a).[1] Section 10-2B-15.01(a) provides: "A foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State." The consequences of noncompliance with this section are set forth in Ala. Code 1975, § 10-2B-15.02(a), which provides, in pertinent part:
 "All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement. . . ."
(Emphasis added.) This "door-closing" statute "bars a foreign corporation not qualified to do business in Alabama from enforcing in an Alabama court a contract it made in Alabama." Hays Corp. v. Bunge Corp.,777 So.2d 62, 64 (Ala. 2000); see S H Contractors, Inc. v. A.J. TaftCoal Co., 906 F.2d 1507, 1510 (11th Cir. 1990). "The law of this state is that a foreign corporation which has not qualified to do business in Alabama at the time of the contract cannot use Alabama courts to enforce that contract." Sanjay, Inc. v. Duncan Constr. Co., 445 So.2d 876, 880
(Ala. 1983).
Significantly, the penalty of § 10-2B-15.02(a) extends to the enforcement of arbitration provisions in contracts made by nonqualifying corporations. See Camaro Trading Co. v. Nissei Sangyo America, Ltd.,577 So.2d 1274 (Ala. 1991) ("Camaro I"), and Camaro Trading Co. v. NisseiSangyo America, Ltd., 628 So.2d 463 (Ala. 1993) ("Camaro II"). Together, these two cases stand for the unremarkable proposition that a "foreign corporation [may] not compel arbitration pursuant to an arbitration clause in a contract [if] the entire contract [is] unenforceable and invalid as a result of the foreign corporation's failure to qualify to do business in Alabama." *Page 287 Alabama Catalog Sales v. Harris, 794 So.2d 312 (Ala. 2000) (discussingCamaro I). Thus, the door-closing statute has a field of operation under the "savings clause" of § 2 of the FAA.
The test of the enforceability of the arbitration clause in the Admission Contract in this case is not, as Community Care contends, whether the transaction substantially affects interstate commerce — which is the proper analysis in cases not involving §10-2B-15.02, see Sisters of the Visitation v. Cochran Plastering Co.,775 So.2d 759 (Ala. 2000) — but "whether the main or primarypurpose of the [transaction] constitutes an interstate or intrastate activity." Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc.,490 So.2d 1242, 1244-45 (Ala.Civ.App. 1986). See also SAR Mfg. Co. v.Dumas Bros. Mfg. Co., 526 F.2d 1283, 1286 (5th Cir. 1976) (applying Alabama law); Camaro II, supra. This is so, because the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3, precludes the application of §§10-2B-15.01 and 10-2B-15.02 against foreign corporations transacting primarily interstate business. See SGB Constr. Servs., Inc. v. Ray SumlinConstr. Co., 644 So.2d 892, 894 (Ala. 1994) ("A nonqualified foreign corporation is not barred from enforcing its contracts in Alabama when its activities within this state are incidental to the transaction of interstate business."); Sanwa Business Credit Corp. v. G.B. "Boots" SmithCorp., 548 So.2d 1336, 1337 (Ala. 1989) ("In order for the preclusion language of . . . [the door-closing statute] to be set into motion, the business of the nonqualified corporation's activities must be `intrastate in nature.'"); see also Stewart Mach. Eng'g Co. v. Checkers Drive InRestaurants of North America, Inc., 575 So.2d 1072 (Ala. 1991); Johnsonv. MPL Leasing Corp., 441 So.2d 904, 905 (Ala. 1983).
However, "establish[ing] a continuing presence in the state over and above the mere shipping of commodities between the states" is intrastate
activity. Wise v. Grumman Credit Corp., 603 So.2d 952, 953 (Ala. 1992) (emphasis added). The Commerce Clause does not protect a foreign corporation from the consequences of noncompliance with a door-closing statute when the corporation has "localized its business" in the forum state, Union Brokerage Co. v. Jensen, 322 U.S. 202, 210 (1944), and has not entered the state merely "to contribute to or to conclude a unitary interstate transaction." Id. at 211.
Applying this rationale, this Court recently concluded that a business involving the breeding, training, and racing of greyhounds was primarily intrastate, despite significant interstate activity. Ex parte DialKennels of Alabama, Inc., 771 So.2d 419 (Ala. 1999). That case involved Dial Kennels of Alabama, Inc., d/b/a Alabama Kennels ("Alabama Kennels"), a nonqualified foreign corporation engaged in breeding greyhounds, on one side of a dispute, and Macon County Greyhound Park, Inc., and the Macon County Racing Commission, on the other side. Id. at 420. At issue were contracts that enabled Alabama Kennels to lease kennel space at the Macon County Greyhound Park ("Greyhound Park") and to race its greyhounds there. Id. at 425. If the relevant business activities of Alabama Kennels were primarily interstate in nature, it could maintain an action for breaches of those contracts, despite the fact that it had not qualified to do business in Alabama.
On that issue, Alabama Kennels provided the affidavit of its owner, Arthur Nienow, who stated:
 "`Alabama Kennels' operation in Macon County housed twenty-six (26) female greyhounds owned by [Arthur *Page 288 
Nienow], personally, and approximately ten (10) which were on contract (36 total) which were used for breeding purposes. Those female greyhounds were bred to dogs all over the United States. Female greyhounds are bred where the stud greyhound resides. Therefore, it is necessary to ship or transport the female greyhounds to the stud ranch wherever it may be located.
 "`After the puppies are born at the Macon County Kennel, they reside there until they are ninety (90) days old. At that time, the puppies are sent to an intermediate school located in West Memphis, Arkansas. They remain at this school until fifteen (15) months old. At that . . . time, the dogs are brought back to Victoryland [the Greyhound Park] for evaluation and finishing, and the kennel then either uses the dog at Victoryland and/or sends the dogs to racetracks all over the country. . . .'"
Id. at 426-27 (emphasis added). Notwithstanding the obvious connections with interstate commerce, this Court stated: "From this evidence, we conclude that Alabama Kennels `localized' its business and thus is barred by Ala. Code 1975, [§ 10-2B-15.02(a)], from pursuing its breach-of-contract claim." 771 So.2d at 427.
Community Care owns and operates a "nursing home" in Jefferson County, in which it houses and cares for patients such as Davis. The operation of this facility, like the operation in Dial Kennels, constitutes a "localized" business activity; the care of Davis was a transaction integral to Community Care's activities.
Moreover, the essence of Community Care's transactions with its residents is labor. According to Tidwell's affidavit, Community Care is a "skilled nursing facility" that rendered "treatment and care" to Davis. In that connection, this Court has stated:
 "`One area of business is quite clearly defined as intrastate, rather than interstate, activity. This Court has previously held that "labor is not an article of commerce, nor is the agreement to supply it, nor the execution of the agreement, an act of commerce." Computaflor v. N. L. Blaum Const. Co., 289 Ala. 65, 68, 265 So.2d 850, 852 (1972), citing American Amusement Co. v. East Lake Chutes Co., 174 Ala. 526, 530, 56 So. 961, 963 (1911). A construction contract supplying both material and labor is an example of the type of contract that is considered intrastate. See Sanjay, Inc. v. Duncan Const. Co., 445 So.2d 876, 879 (Ala. 1983) (sale, delivery, and supply of labor and management to construct prefabricated building is intrastate activity); Computaflor, supra, (sale, delivery, and labor to construct a gymnasium floor are intrastate activities); Cadden-Allen, Inc. v. Trans-Lux News Sign Corp., 254 Ala. 400, 48 So.2d 428 (1950). . . .'"
Building Maint. Pers., Inc. v. International Shipbuilding, Inc.,621 So.2d 1303, 1305 (Ala. 1993).
In short, Community Care entered Alabama to establish a business as a "health-care provider," within the meaning of the Alabama Medical Liability Act of 1987, Ala. Code 1975, § 6-5-540 et seq. See Husbyv. South Alabama Nursing Home, Inc., 712 So.2d 750, 753 (Ala. 1998) ("for purposes of the Alabama Medical Liability Act, a nursing home is considered a hospital"); Ex parte Northport Health Serv., Inc.,682 So.2d 52 (Ala. 1996) (counts against a nursing-home operator for breach of contract, negligence, and wrongful death, alleging abuse, mistreatment, and neglect of a nursing home resident, stated a claim for "medical malpractice"). Because it arose out of a localized activity, the primary purpose of the labor-intensive transaction between Davis and Community *Page 289 
Care was intrastate. Therefore, having failed to comply with 10-2B-15.01, Community Care may not enforce the provisions of the Admission Contract, including the arbitration clause. Camaro I, supra.
For these reasons, the trial court did not err in denying Community Care's motion to compel arbitration. The order of the trial court is affirmed.
AFFIRMED.
Houston, Brown, Johnstone, Harwood, and Stuart, JJ., concur.
Moore, C.J., concurs in the result.
Lyons, J., recuses himself.
[1] The effect of such a revocation is that the corporation's authority "to transact business in this state ceases on the date shown on the certificate revoking its certificate of authority." Ala. Code 1975, § 10-2B-15.31(c).