SEE, Justice
(dissenting).
I respectfully dissent from the majority’s affirmance without opinion of the trial court’s dismissal of DecisionQuest, Inc.’s, action against Robert B. Roden, Robert J. Hayes, and Huel M. Carter on theories of breach of contract, account stated, and quantum meruit.
DecisionQuest, Inc. (“DQ”), is a trial consulting firm specializing in jury research and trial-defense strategy development. A subsidiary, DQ[2]™, produces trial exhibits. DQ, a California corporation, is a wholly owned subsidiary of Dames & More, Inc., and operates offices in Los Angeles, Houston, New York, Boston, Chicago, Washington, D.C., and Atlanta.
In 1996, Robert B. Roden, Robert J. Hayes, and Huel M. Carter (hereinafter referred to collectively as “the defendants”) were indicted in the State of Alabama for acts arising out of their practice of law while they were shareholders in the law firm, Roden, Hayes & Carter, P.C. Roden was indicted on multiple counts alleging first-degree theft of property, § 13A-8-3, Ala.Code 1975; second-degree theft of property, § 13A-8-4, Ala.Code 1975; and possession of a forged instrument, § 13A-8-6, Ala.Code 1975. Hayes and Carter were each indicted on multiple counts of first-degree theft of property, one count of second-degree theft of property, and one count alleging that they had intimidated a witness, § 13A-10-124, Ala. Code 1975.
On October 29, 1996, the late David Cromwell Johnson, Roden’s criminal defense attorney, contacted Rick Fuentes, DQ’s director of trial consulting services at DQ’s office in Atlanta, about purchasing from DQ a juror profile,[1] defense strategy, and trial exhibits for Roden’s upcoming criminal trial. Fuentes traveled to Birmingham to meet with Johnson and Ro-den, and with Hayes, Carter, and Hayes’s and Carter’s attorneys to discuss the type of trial-support products DQ could create for them. After the meeting, Johnson hired DQ to produce a juror profile and a defense strategy. Johnson faxed DQ instructions to bill Roden directly for DQ’s services at the address of the Roden, Hayes & Carter law firm.
The juror profile describes the attitudes and beliefs of potential veniremembers with respect to a particular case. In order to create the profile in Roden’s case, DQ’s Atlanta office developed a survey instrument designed to collect data from which DQ’s analysts could then construct a model that would explain how potential jurors would evaluate the various issues to be tried by this case. DQ hired the Parker Group, an Alabama vendor, to conduct a telephone survey in Jefferson County us *92 ing the survey instrument DQ provided. DQ’s Atlanta office analyzed the data it received from the Parker Group and created a profile of the Jefferson County jury pool. DQ produced a written report, and its staff made an oral presentation of results to Johnson, Roden, Hayes, and Carter.
The “trial strategy” recommends the narrative or storyline DQ believes the defense should construct at trial to explain the case to the jury. DQ developed the trial strategy by evaluating how simulated jurors responded to a videotape that presented defense arguments and likely prosecution arguments. DQ first consulted with Roden’s, Hayes’s, and Carter’s attorneys to learn the facts of the case. Using this information, DQ’s Atlanta office produced a trial videotape in which a neutral presenter summarized the best potential arguments for the prosecution and for the defense. DQ hired Focus One in Jackson, Mississippi, to recruit and pay a pool of simulated jurors in Jefferson County for the trial exercise. DQ hired Merida Interactive Information Services, a Pennsylvania company, to provide the equipment and staff to run the trial exercise. On January 10, 1997, two DQ staff members traveled from Atlanta to Birmingham to participate as discussion leaders in the final phase of the trial exercise.
During the trial exercise, the simulated jurors viewed the trial videotape and provided feedback about their reactions to the arguments presented by the prosecution and the defense. The simulated jurors provided much of the feedback in “real time,” using handheld computers to record their immediate reaction to the arguments. After they finished viewing the tape, the simulated jurors deliberated, much as a real jury might, about whether Roden, Hayes, and Carter were guilty. After the deliberations, DQ staff interviewed the simulated jurors about them reactions to some of the specific arguments presented on the tape. The deliberations and interviews were videotaped for subsequent detailed content analysis by DQ staff in Atlanta. After the one-day trial exercise, DQ staff in Atlanta evaluated the simulated jurors’ responses in order to create a trial strategy. DQ staff in Atlanta produced a written report that summarized the jurors’ responses and that outlined DQ’s recommended trial strategy.[2] DQ staff also produced sample trial graphics.
Shortly after DQ completed its evaluation of the trial exercise, three DQ staff members — Rick Fuentes, Bob Minik, and Angela Rose — traveled to Birmingham to present their results. After the presentation, Johnson, Roden, Hayes, and Carter agreed to purchase trial graphics from DQ that could be used to implement the proposed defense strategy. DQ produced the trial graphics at its Houston office and Roden, Hayes, and Carter used the graphics at their trial.
On February 14, 1997, following three weeks of trial in the criminal cases against Roden, Hayes, and Carter, Roden and Hayes pleaded guilty to four misdemeanor charges: obtaining a signature by deception; making a contribution in the name of another person, in violation of the Alabama Fair Campaign Practices Act; misapplication of property; and falsifying business records. Carter pleaded guilty to two misdemeanor charges: obtaining a signature *93 by deception and making a contribution in the name of another person, in violation of the Alabama Fair Campaign Practices Act.
Between December 1996 and February 1997, DQ mailed Roden eight invoices totaling $101,254.16. Roden never paid DQ. On April 17, 1998, DQ sued Johnson, Ro-den, Hayes, and Carter on theories of breach of contract, account stated, and quantum meruit.[3]
From April 17, 1998, until February 2002, the parties filed numerous pleadings, answers, and motions with the trial court. In addition, various other parties were brought in and then subsequently dismissed from this action.[4]
On February 11, 2002, Hayes moved for a judgment on the pleadings. On February 13, 2002, Hayes moved to supplement his motion for a judgment on the pleadings, asserting that DQ, a California corporation, had not obtained a certificate of authority to do business in Alabama. Hayes argued that DQ was not qualified to do business in Alabama at the time of the contract, and, therefore, that under Alabama’s door-closing statute, the contract and all other agreements on which DQ bases its theories of recovery are void. On the same day, Carter moved for a judgment on the pleadings, adopting Hayes’s motion and attachments. The trial court set a hearing on the motions for February 19, 2002.
After the February 19 hearing, the trial court entered the following order:
“At the hearing on the various Motions for Judgment on the Pleadings this Court determined that it should continue the trial setting in this case and re-open the time for filing Amended Answers so as to allow additional affirmative defenses to be pleaded. Counsel may then obtain a new hearing for the Motions for Judgment on the Pleadings.”
Subsequently, Roden moved to dismiss the action and asserted as an affirmative defense that the contract with DQ was void because when Roden and DQ entered into it, DQ was not qualified to do business in Alabama. On March 7, 2002, DQ moved to strike the defendants’ amended answers and also filed a supplemental response to their motions for a judgment on the pleadings, alleging that the contract at issue was not subject to the defendants’ affirmative defense because the contract was interstate in nature.
On March 8, 2002, the trial court held a hearing on DQ’s motion to strike the defendants’ answers. At the hearing, Roden filed an affidavit stating that the agreement was entered into in Alabama and that the agreement specified that all work was to be done in Jefferson County, Alabama. He attached to the affidavit a copy of the agreement which, he asserted, showed that the work performed under the agreement was intrastate in nature. The trial court entered the following order:
“The Plaintiffs Motion to Strike the Defendants’ amended answer, both written and oral, are [sic] Denied. The Motion to Dismiss filed 2/19/02 by Defendant Robert B. Roden is GRANTED. The Motion for Judgment on [the] Pleadings filed 2/13/02 by Defendant Huel M. Carter is GRANTED. The Motion of Defendant Robert J. Hayes for Judgment on the Pleadings filed 2/11/02 and Supplemental Motion of De *94 fendant Robert J. Hayes for Judgment on the Pleadings filed 2/13/02 are GRANTED. Judgment is rendered in favor of all Defendants and against the Plaintiff on all issues in this case. Costs are taxed to the Plaintiff.”
DQ now appeals, arguing that the transaction was an interstate transaction not subject to Alabama’s door-closing statute, § 10-2B-15.02, Ala.Code 1975. I agree; I would reverse the trial court’s dismissal of DQ’s contract action against Roden, Hayes, and Carter.[5]
Section 10-2B-15.02, Ala.Code 1975, bars a foreign corporation from bringing a contract action in an Alabama court unless the foreign corporation has properly registered to do business in Alabama before entering into any contract it subsequently seeks to enforce.[6] “[T]he Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3, [however,] precludes the application of §§ 10-2B-15.01 and 10-2B-15.02 against foreign *95 corporations transacting primarily interstate business.” Community Care of America of Alabama, Inc, v. Davis, 850 So.2d 283, 287 (Ala.2002); Brown v. Pool Depot, Inc., 853 So.2d 181, 185 (Ala.2002)(acknowledging that a nonquali-fied corporation may enforce its contracts when it is engaged in interstate commerce); Stewart Machine & Eng’g Co. v. Checkers Drive In Restaurants of North America, Inc., 575 So.2d 1072, 1074 (Ala.1991)(“[B]usinesses engaged in interstate commerce are protected by the commerce clause in the United States Constitution ... and are therefore immune from the effects of the ‘door closing’ statutes .... Additionally, we note a second exception for foreign corporations whose activities in Alabama are merely incidental to a transaction of interstate business.”). A door-closing statute will not be enforced “if its enforcement in a particular ease would unduly burden interstate commerce .... ” S & H Contractors, Inc. v. A.J. Taft Coal Co., 906 F.2d 1507, 1510 (11th Cir.1990).
Interstate commerce takes many forms. “ ‘[A]ll interstate commerce is not sales of goods. Importation into one state from another is the indispensable element, the test, of interstate commerce; and every negotiation, contract, trade, and dealing between citizens of different states, which contemplates and causes such importation, whether it be of good, person, or information, is a transaction of interstate commerce.’ ”
Uncle Ben’s, Inc. v. Crowell, 482 F.Supp. 1149, 1154 (E.D.Ark.1980)(quoting Furst v. Brewster, 282 U.S. 493, 497, 51 S.Ct. 295, 75 L.Ed. 478 (1931)). “[F]or purposes of commerce clause analysis, interstate commerce includes ‘any activity of an intrastate nature which [is] an integral part of an overall interstate pattern or transaction.’ ” Radio WHKW, Inc. v. Yarber, 838 F.2d 1439, 1443 (5th Cir.1988)(quoting Diversacon Indus. v. National Bank of Commerce, 629 F.2d 1030, 1033 (5th Cir.1980)).
This Court has consistently held that “[a] non-qualified foreign corporation is not barred from enforcing its contracts in Alabama when its activities within this state are incidental to the transaction of interstate business.” North Alabama Marine, Inc. v. Sea Ray Boats, Inc., 533 So.2d 598, 601 (Ala.1988). A foreign corporation may enforce its contracts so long as it has not “ ‘localized its business’ in the forum state,” Community Care of America, 850 So.2d at 287 (quoting Union Brokerage Co. v. Jensen, 322 U.S. 202, 210, 64 S.Ct. 967, 88 L.Ed. 1227 (1944)), and so long as it has entered the state merely “ ‘to contribute to or to conclude a unitary interstate transaction.’ ” Community Care of America, 850 So.2d at 287 (quoting Union Brokerage Co., 322 U.S. at 211, 64 S.Ct. 967).
Roden, Hayes, and Carter argue that the trial court correctly found that they could void their agreement with DQ and not pay DQ for the goods and services it had already provided to them, because DQ was not qualified to do business in Alabama at the time Roden, Hayes, and Carter sought out and agreed to purchase a trial strategy from DQ. Roden, Hayes, and Carter argue that DQ conducted jury research in Alabama, using Alabama citizens and hiring Alabama firms. Roden, Hayes, and Carter further argue that their agreement with DQ states that DQ “was obligated [under the agreement] ‘to assist [Roden] and your colleagues in the preparation of the State v. Roden litigation in Jefferson County, Alabama’ [and that] [p]laintiff [DQ] promised to ‘conduct the research in Birmingham utilizing Jefferson County jurors.’ ” (Appellees’ Brief at 7-8, quoting from a letter to David Cromwell Johnson from Rick Fuentes.) Roden, Hayes, and Carter also argue that
*96 “the undisputed affidavit of Defendant Roden confirms that all of [DQ’s] work was to be conducted in Alabama with respect to a trial to take place in Alabama, that Plaintiffs employees came to Alabama for a number of meetings, that Jefferson County residents were surveyed, that focus groups consisting solely of Jefferson County residents were hired by [DQ], and that [DQ] was hired to determine how a typical jury in Jefferson County, Alabama, would react to various issues involved in the underlying Jefferson County trial.”
(Appellees’ Brief at 9.)
Roden, Hayes, and Carter, however, did not hire DQ to perform labor in Jefferson County; instead, they purchased from DQ a piece of intellectual property — a trial strategy. When an Alabama consumer purchases information from a California corporation doing business in Georgia, that transaction is an interstate transaction. The work DQ performed in Alabama to fulfill its contractual obligation to Roden, Hayes, and Carter was incidental to that interstate transaction. “ ‘[A]ny activity of an intrastate nature which [is] an integral part of ” that interstate transaction is also interstate commerce for the purpose of considering whether the Commerce Clause preempts a state’s door-closing statute. Radio WHEW, 838 F.2d at 1443.
Roden, Hayes, and Carter argue that even if DQ was engaged in some interstate activity, DQ performed both interstate and intrastate activities when it created the trial strategy and DQ became subject to the door-closing statute based on its intrastate work. They cite Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc., 490 So.2d 1242, 1244-45 (Ala.Civ.App.1986), in support of the proposition that when a transaction involves both interstate and intrastate activities, “one must separate the interstate and intrastate activities and then determine whether the main or primary purpose of the contract constitutes an interstate or intrastate activity.”[7]
In Competitive Edge, a New Mexico advertising agency created and placed television advertising for Tony Moore Buick-GMC. Competitive Edge’s account executive met frequently with Tony Moore in Huntsville or in Decatur. Competitive Edge shot television commercials on the Moore-GMC dealership lot. Competitive Edge wrote advertising scripts based on changes in Moore GMC’s inventory. Finally, Competitive Edge negotiated air time with Huntsville television stations to broadcast Moore-GMC’s commercials.
The Court of Civil Appeals recognized in Competitive Edge that “transactions in Alabama by a nonqualified foreign corporation involving no more than a sale, transportation, and delivery of materials into this state are acts of interstate commerce to which the laws of Alabama are not applicable.” 490 So.2d at 1244. The Court of Civil Appeals found, however, that Competitive Edge was distinguishable from cases involving a sale of products because Competitive Edge’s “contract [with Moore-GMC] also involved the negotiating for and procuring of air time from *97 three Huntsville television stations.” 490 So.2d at 1244. The Court of Civil Appeals held that the contract in Competitive Edge was an intrastate transaction because “the primary purpose of the contract between Competitive Edge and Moore-GMC was the service which was agreed to be rendered under it, i.e.[,] the broadcasting of automobile advertisements in the local area.” 490 So.2d at 1246. Thus, although the primary purpose of the contract was the intrastate placement and broadcasting of the commercials, it is most significant for the case before us that, notwithstanding the frequent meetings between Competitive Edge’s account representative and Tony Moore in Alabama and notwithstanding that Competitive Edge shot television commercials on the Moore-GMC dealership lot in Alabama, the Court of Civil Appeals concluded that the production and transportation of the videotaped commercials was an interstate transaction. 490 So.2d at 1246. The trial strategy, embodied in the reports DQ forwarded to Roden, Hayes, and Carter, is like the videotaped commercials forwarded by Competitive Edge. It was David Cromwell Johnson and Roden, Hayes, and Carter who were to implement the trial strategy in Alabama, not DQ. Thus, while the implementation of the trial strategy was intrastate in nature, the preparation of that strategy by DQ and the forwarding of it to Roden, Hayes, and Carter was an interstate transaction.
Moreover, the mere fact that DQ created a trial strategy adapted specifically to Jefferson County does not make the transaction an intrastate transaction. In Wallace Construction Co. v. Industrial Boiler Co., 470 So.2d 1151, 1152 (Ala.1985), Industrial Boiler Company, a Georgia company, designed and manufactured a boiler system to satisfy specific design requirements established by the University of Monteval-lo’s project bid specifications. This Court’s analysis of the application of the door-closing statute in Wallace Construction assumed that the sale by a foreign manufacturer to a domestic consumer of a custom-designed industrial boiler was an interstate transaction.
Also in this case, DQ’s actions in Alabama do not transform its interstate sale of a trial strategy to Roden, Hayes, and Carter into an intrastate transaction. DQ’s initial meetings in Alabama with Ro-den, Hayes, and Carter, and the final presentation in Alabama of DQ’s recommended trial strategy do not constitute intrastate activities sufficient to trigger the door-closing statute because “acts such as delivering materials or soliciting business are generally not enough to constitute ‘doing business.’ ” Green Tree Acceptance, Inc. v. Blalock, 525 So.2d 1366, 1370 (Ala.1988). Also, the fact that DQ purchased from an Alabama vendor survey data about public attitudes in Jefferson County and used Mississippi and Pennsylvania vendors to assemble and to conduct portions of the trial exercise in Jefferson County does not transform the interstate sale of a trial strategy to Roden, Hayes, and Carter into an intrastate transaction. “A foreign corporation must enjoy the same access to the domestically-provided goods and services required to complete its interstate business as is enjoyed by domestic corporations.” Radio WHKW, 838 F.2d at 1445.
In Radio WHEW, an Alabama radio station not qualified to do business in Mississippi sought to enforce, in Mississippi, a noncompetition agreement signed by a former employee. The trial court held that the radio station’s action was barred by Mississippi’s door-closing statute. The United States Court of Appeals for the Fifth Circuit reversed the trial court’s judgment and held that although the radio station maintained a sales office in Mississippi, purchased supplies in Mississippi, leased automobiles for its sales staff in *98 Mississippi, and entered into numerous other contracts in Mississippi to sell advertising time, the radio station had engaged merely in a series of unitary transactions, and had not localized its business sufficiently to allow Mississippi’s door-closing statute to serve as a bar to the radio station’s contract action against the former employee. 838 F.2d at 1441-43. The court reasoned that although the radio station had extensive contacts with Mississippi, those contacts did not localize the radio station’s business in Mississippi because the radio station’s primary business remained the interstate broadcast of radio signals. 838 F.2d at 1443.
Similarly, in Wallace Construction, this Court held that Industrial Boiler, a Georgia corporation, had not localized its business in Alabama and that the interstate sale of a boiler did not acquire an intrastate character merely because Industrial Boiler hired three to five local residents and leased construction equipment locally in order to install the boiler system at the University of Montevallo. 470 So.2d at 1152.[8] This Court held that the labor performed to install the boiler was incidental to the sale of the boiler. 470 So.2d at 1155. This case is even more compelling. DQ sold Roden, Hayes, and Carter a trial strategy rather than a boiler; however, DQ did not appear in court on behalf of Roden, Hayes, and Carter to carry out the strategy. In effect, DQ sold Roden, Hayes, and Carter the “boiler,” but left it to Roden, Hayes, and Carter to find someone else to handle the installation.
DQ’s sale of the trial strategy and the trial graphics to Roden, Hayes, and Carter is a unitary interstate transaction; therefore, the trial court erred when it dismissed DQ’s action on its contract seeking to compel Roden, Hayes, and Carter to pay for the trial strategy and trial graphics they purchased from DQ. Therefore, I dissent.

. DQ refers to this as a "venue evaluation.”

. Roden, Hayes, and Carter argue that DQ was hired to conduct a survey and to make a presentation to some focus groups in order to gauge potential juror attitudes. DQ presented Roden, Hayes, and Carter with much more than "survey results." For example, in one report, DQ provided Roden, Hayes, and Carter with a draft opening statement and with a list of themes that could be developed at trial.

. One of DQ’s allegations on appeal is that it was understood that its services were performed not only for Johnson’s client Roden, but also for Hayes and Carter. As a result, DQ alleges, Hayes and Carter were also parties to the agreement and are liable for its breach.

. David Cromwell Johnson is deceased and as to him the case has been dismissed.

. There is no dispute as to the appropriate standard of review in this case. While the trial court characterizes its order as one granting a motion to dismiss based on the pleadings, because both sides submitted supporting evidentiary material the motion is properly treated as one for a summary judgment.
"If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.”
Rule 12(b), Ala. R. Civ. P. Properly framed, the issue before the trial court and before this Court on appeal is whether there is a genuine issue of material fact as to whether the transaction was interstate in nature, thereby relieving DQ of the need to qualify to do business in Alabama before DQ may avail itself of Alabama’s courts.
This Court reviews a summary judgment de novo. We use the same standard the trial court used to determine whether the evidence made out a genuine issue of material fact, see Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was "entitled to a judgment as a matter of law.” Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P.
" 'When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the non-movant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is "substantial” if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Wright[v. Wright], 654 So.2d [542] at 543 [(Ala.1995)] (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).' ”
Walker v. City of Montgomery, 833 So.2d 40, 43 (Ala.2002)(quoting Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997)).

. Alabama’s door-closing statute reads, in pertinent part:
"(a) A foreign corporation transacting business in this state without a certificate of authority or without complying with Sections 40-14-1 to 40-14 — 3, inclusive, 40-14— 21, or 40-14-41, may not maintain a proceeding in this state without a certificate of authority. All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement; but nothing in this section shall abrogate the equitable rule that he who seeks equity must do equity.”
§ 10-2B-15.02(a), Ala.Code 1975.

. They also cite Vines v. Romar Beach, Inc., 670 So.2d 901 (Ala.1995), for the proposition that even a single act of business carried on in furtherance of a corporation’s purpose is sufficient to bring a company under the door-closing statute. Vines actually held that the intrastate activities at issue were not incidental to the company's purpose, and that the foreign corporation had been organized for the sole purpose of doing business in Alabama. 670 So.2d at 903-04. This case is distinguishable because DQ is not in the business of conducting telephone surveys or of recruiting simulated jurors (which is why they contracted those tasks to other vendors); DQ is in the business of creating and selling trial-defense strategies.

. This case can be contrasted with Ex parte Dial Kennels of Alabama, 771 So.2d 419 (Ala.1999). In Dial Kennels, this Court found that when Dial Kennels bred greyhound puppies in Alabama, raised them for 90 days, transported the puppies out of state for training, and then returned the puppies for use in Alabama, Dial Kennels was engaged in intrastate activity. Dial Kennels is distinguishable because this Court held that the kennel localized its business by creating an ongoing dog-breeding business. 771 So.2d at 427. In the present case, DQ engaged in a one-time transaction with Roden, Hayes, and Carter. A unitary transaction in which a company does not localize its business is generally not intrastate in character. See Community Care of America, 850 So.2d at 287. Moreover in this case, DQ engaged in what, for it, constituted a series of interstate transactions in order to complete the contract with Roden, Hayes, and Carter. DQ, operating from Georgia, purchased survey data from an Alabama company; DQ also purchased services from Mississippi and Pennsylvania companies.