BOLIN, Justice.
Sacha Baron Cohen; Twentieth Century Fox Film Corporation; One America Productions, Inc., d/b/a Springland Films; Everyman Pictures; Dune Entertainment, L.L.C.; MTV Networks; Comedy Central; Dakota North Entertainment, Inc.; and Four by Two Production Company (hereinafter collectively referred to as “the petitioners”), the defendants in an action filed in the Jefferson Circuit Court by Kathie Martin, moved the trial court to dismiss Martin’s claims against them on the basis of a forum-selection clause in the contract *510 between Martin and Springland Films that provides that New York County, New York, is the exclusive venue for Martin’s claims. The trial court denied the petitioners’ motion. The petitioners now seek mandamus relief from this Court. We grant their petition and issue the writ.
I.
Kathie Martin owns and operates the Etiquette School of Birmingham, which provides etiquette training to individuals and corporate groups. Sometime in October 2005, Todd Schulman, an employee of One America Productions, contacted Martin via telephone to inquire about her business and to assess her interest in participating in what he described as a documentary being filmed for Belarusian television about the experiences of a foreign reporter traveling in the United States.[1] Martin agreed to give the reporter a lesson on dining etiquette, and, on October 24, 2005, she traveled to the Tutwiler Hotel in Birmingham for the filming of the lesson. Upon arriving at the Tutwiler Hotel, Martin was presented with a document entitled “Standard Consent Agreement,” which she signed. That document (hereinafter referred to as “the consent agreement”) provided, in pertinent part:
“This is an agreement between Springland Films (the ‘Producer’) and the undersigned participant (the ‘Participant’). In exchange for the Producer’s obligation to pay a participation fee in the amount of $350 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:
“1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the ‘Film’). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.
“2. The Participant agrees that any rights that the Participant may have in the Film or the Participant’s contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability to the Participant, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant’s contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.
[[Image here]]
“4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant’s name or likeness or image), (b) damages caused by ‘acts of God’ (such as, but not limited to, injuries from natural disasters), (c) dam *511 ages caused by acts of terrorism or war, (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (e) false light (such as any allegedly false or misleading portrayal of the Participant), (f) infliction of emotional distress (whether allegedly intentional or negligent), (g) trespass (to property or person), (h) breach of any alleged contract (whether the alleged contract is verbal or in writing), (i) allegedly deceptive business or trade practices, (j) copyright or trademark infringement, (k) defamation (such as any allegedly false statements made on the Film), (Z) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (m) prima facie tort (such as alleged intentional harm to the Participant), (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement), (o) breach of alleged moral rights, or (p) tortious or wrongful interference with any contracts or business of the Participant, or any claim arising out of the Participant’s viewing of any sexually-oriented materials or activities.
[[Image here]]
“6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State of New York and County of New York, under the laws of the State of New York.”
After signing the consent agreement, Martin was introduced to the alleged foreign reporter who was the subject of the film, and they proceeded to begin filming the dining-etiquette lesson. It is sufficient to say that an eventful meal ensued during which the alleged reporter engaged in behavior that would generally be considered boorish and offensive.
After the lesson concluded, Martin telephoned her husband and related what had occurred. After hearing Martin’s description of what had happened and being suspicious of the alleged reporter, Martin’s husband sent to Martin’s office pictures of two characters played by comedian and actor Sacha Baron Cohen on his HBO television series “Da Ali G Show,” Ali G and Borat, which he had gotten off the Internet. Martin then learned for the first time that the alleged foreign reporter was in fact Cohen in character as Borat, a fictitious journalist from Kazakhstan.
Unbeknownst to Martin, her lesson with Borat had in fact been filmed not for use in a Belarusian television documentary, but for inclusion in a major Hollywood motion picture, Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan (hereinafter referred to as “the Borat movie”), distributed by Twentieth Century Fox Film Corporation. The Borat movie, which was assigned an R-rating by the ratings board based on strong crude and sexual content and graphic nudity and language, was released in the United States on approximately November 3, 2006, and went on to gross more than $200 million worldwide. Martin was identified by name in the film, which included portions of her etiquette lesson with Borat. Segments of Martin’s initial meeting with Borat were also used in the film’s advertising and promotion.
On December 22, 2006, Martin, claiming that she had been embarrassed and humiliated by her encounter with Borat and her inclusion in and association with the Borat *512 movie, sued Cohen, the production companies associated with the Borat movie, and other parties related to the film, in the Jefferson Circuit Court, stating claims alleging fraud and deceit, quasi-contract and unjust enrichment, commercial appropriation and invasion of privacy, and intentional infliction of emotional distress. The petitioners responded by filing, pursuant to Rule 12(b)(3), Ala. R. Civ. P., a motion to dismiss for improper venue, based on the forum-selection clause in the consent agreement naming New York as the proper venue for any claims arising out of that agreement.[2] In her response to the motion to dismiss, Martin argued, among other things, that the consent agreement that included the forum-selection clause was void because the only defendant that was a signatory to that agreement — Springland Films — was not qualified to do business in Alabama and that, pursuant to Alabama’s door-closing statute, § 10-2B-15.02(a), Ala.Code 1975, the consent agreement was therefore void.[3] The petitioners filed a reply, arguing that they were engaged in interstate commerce in making the film and that the Commerce Clause in the United States Constitution accordingly shielded them from § 10-2B-15.02(a). See North Alabama Marine, Inc. v. Sea Ray Boats, Inc., 533 So.2d 598, 601 (Ala.1988) (stating that the United States Constitution bars Alabama from preventing a foreign corporation that has not qualified to do business in Alabama “from enforcing its contracts in Alabama when its activities within this state are incidental to the transaction of interstate business”).
On April 26, 2007, after receiving further briefing on the issue and holding a hearing, the trial court denied the petitioners’ motion to dismiss on the basis that the consent agreement was void and unenforceable under § 10-2B-15.02(a) because Springland Films was not qualified to do business in Alabama. On June 7, 2007, the petitioners timely petitioned this Court for a writ of mandamus directing the trial court to vacate its April 26, 2007, order and to grant their motion to dismiss.
II.
“ ‘[A] petition for a writ of mandamus is the proper vehicle for obtaining review of an order denying enforcement of an “outbound” forum-selection clause when it is presented in a motion to dismiss.’ Ex parte D.M. White Constr. Co., 806 So.2d 370, 372 (Ala.2001); see Ex parte CTB, Inc., 782 So.2d 188, 190 (Ala.2000). ‘[A] writ of mandamus is an extraordinary remedy, which requires the petitioner to demonstrate a clear, legal right to the relief sought, or an abuse of discretion.’ Ex parte Palm Harbor Homes, Inc., 798 So.2d 656, 660 (Ala.2001). ‘[T]he review of a trial court’s ruling on the question of enforcing a forum-selection clause is for an abuse of discretion.’ Ex parte D.M. White Constr. Co., 806 So.2d at 372.”
*513 Ex parte Leasecomm Corp., 886 So.2d 58, 62 (Ala.2003). Thus, we review the trial court’s April 26, 2007, order to determine whether the trial court exceeded its discretion in concluding that the consent agreement was void because Springland Films failed to register to do business in Alabama.
III.
We first note that at the trial court level there was some question as to whether the relevant test for determining whether the Commerce Clause barred the application of § 10-2B-15.02(a) in this case was: 1) whether the primary purpose of the transaction between Martin and Springland Films was interstate commerce, or 2) whether the transaction between Martin and Springland Films merely affected interstate commerce. Our opinion in Briarcliff Nursing Home, Inc. v. Turcotte, 894 So.2d 661, 667 (Ala.2004), issued after the Supreme Court of the United States decided Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003), makes clear that the test in cases involving § 10-2B-15.02(a) remains whether the primary purpose of the transaction constitutes an interstate activity:
“[I]n Community Care [of America of Alabama, Inc. v. Davis, 850 So.2d 283 (Ala.2002) ], this Court also stated:
“ ‘The test of the enforceability of the arbitration clause in the Admission Contract in this case is not, as Community Care contends, whether the transaction substantially affects interstate commerce — which is the proper analysis in cases not involving § 10-2B-15.02, see Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000) — but “whether the main or primary purpose of the [transaction] constitutes an interstate or intrastate activity.” Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc., 490 So.2d 1242, 1244-45 (Ala.Civ.App.1986).’
“Community Care, 850 So.2d at 287. In Community Care, Community Care was attempting to enforce a contract (specifically an arbitration provision in the admission contract); however, it was not qualified to do business in Alabama at the time it entered into the admission contract. This Court held that the penalty of § 10-2B-15.02(a), Ala.Code 1975, extends to the enforcement of arbitration provisions. Id. at 286. Section 10-2B-15.02(a) is a ‘door closing’ statute that ‘ “bars a foreign corporation not qualified to do business in Alabama from enforcing in an Alabama court a contract it made in Alabama.” ’ Community Care, 850 So.2d at 286 (quoting Hays Corp. v. Bunge Corp., 777 So.2d 62, 64 (Ala.2000)). Therefore, this Court held that § 10-2B-15.02(a) voided the admission contract and changed the test of the enforceability of the arbitration provision from whether it substantially affects interstate commerce to ‘“whether the main or primary purpose of the [transaction] constitutes an interstate or intrastate activity.” ’ 850 So.2d at 287 (quoting Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc., 490 So.2d 1242, 1244-45 (Ala.Civ.App.1986)). The present case does not involve § 10-2B-15.02(a); therefore, the proper test is whether the activity substantially affects interstate commerce.”
894 So.2d at 667. Because this case does involve 10-2B-15.02(a), the proper test is accordingly whether the main or primary purpose of the transaction between Martin and Springland Films constitutes an interstate, or an intrastate, activity. That, in turn, depends on how the purpose of the transaction is defined.
*514 The petitioners argue that “[t]he purpose of the [consent] agreement between [Martin] and One America [d/b/a Springland Films] was to provide for [Martin]’s appearance in an internationally distributed motion picture.” (Petition at p. 2.) Martin, however, argues that the purpose of the consent agreement “was for Mrs. Martin to provide dining etiquette services for filming in the State of Alabama” and that “[n]o mention was ever made about Mrs. Martin participating in any production or distribution of a ‘motion picture’ or, for that matter, any activities outside of Alabama.” (Response to petition at p. 6.) For the reasons that follow, we agree with the petitioners.
When attempting to discern the purpose of a contract, “this Court must first look to the plain language of the contract.” Turner v. West Ridge Apartments, Inc., 893 So.2d 332, 335 (Ala.2004). The plain language of the consent agreement makes clear that the transaction between Martin and Springland Films was not, as Martin attempts to portray it, a simple exchange pursuant to which Martin was to provide one filmed etiquette lesson in return for $350. Indeed, the consent agreement makes no mention of Martin’s providing any services in exchange for the $350 payment. Rather, pursuant to the terms of the consent agreement, Martin was given the $350 payment “and the opportunity for [Martin] to appear in a motion picture” in exchange for her agreement, among other things, “to be filmed and audiotaped by [Springland Films] for a documentary-style film” and to assign to Springland Films any rights she may have in the recorded material so as to allow Springland Films to use the material “without restriction in any media throughout the universe in perpetuity.”
Thus, although Martin has characterized the primary purpose of the transaction as “the provision of local labor by Mrs. Martin” (response to petition at p. 24), which, under Alabama caselaw, would clearly be an intrastate activity, see Building Maintenance Personnel, Inc. v. International Shipbuilding, Inc., 621 So.2d 1303, 1305 (Ala.1993) (noting that labor is not an article of commerce and “ ‘is quite clearly defined as intrastate, rather than interstate, activity’ ” (quoting Green Tree Acceptance, Inc. v. Blalock, 525 So.2d 1366, 1370 (Ala.1988))), the transaction here clearly encompassed more than Martin’s providing labor. The plain language of the consent agreement indicates that any provision of services by Martin was incidental to the actual purpose of the transaction— to provide for Martin’s appearance in recorded footage that might be used “without restriction in any media throughout the universe.”[4] Accordingly, we hold that the primary purpose of the transaction between Martin and Springland Films constituted an interstate activity. This is true notwithstanding the fact that the filming, the execution of the consent agreement (along with the assignment of rights therein), and Springland Films’ payment to Martin all took place in Alabama.
We further note that Martin’s argument that the petitioners failed to make their current argument to the trial court and that their petition should now be denied on that basis is without merit. Citing Kingvision Pay-Per-View, Ltd. v. Ayers, 886 So.2d 45 (Ala.2003), Martin argues *515 that the petitioners argued below only that the transaction with Martin affected interstate commerce — not that its primary purpose was interstate commerce — and that because the petitioners did not make the latter argument in the trial court the argument was waived and cannot now be made. See Smith v. Equifax Servs., Inc., 537 So.2d 463, 465 (Ala.1988) (stating that “this Court will not reverse the trial court’s judgment on a ground raised for the first time on appeal”). The appellant in Kingvision sought to have a default judgment against it vacated. In the trial court, the appellant had argued that it had a meritorious defense to the plaintiffs claims; however, the appellant apparently did not at that time address the other two elements of the three-factor test this Court first enunciated in Kirtland v. Fort Morgan Authority Sewer Service, Inc., 524 So.2d 600 (Ala.1988), for challenging a default judgment — whether the plaintiff would be prejudiced if the judgment was set aside and whether the default judgment was the result of the appellant’s own culpable conduct. Thus, because the appellant did not argue to the trial court that its case met the three-part test, this Court did not allow it to make that argument on appeal.
In the present case, the petitioners did first argue to the trial court that the Commerce Clause barred the application of § 10-2B-15.02(a) because their transaction with Martin merely affected interstate commerce. However, after Martin argued that the proper test was whether the primary purpose of the transaction was interstate, the petitioners responded by arguing that they were entitled to relief under the test advocated by Martin as well. At the April 26, 2007, hearing on this matter, the petitioners’ counsel argued:
“What [an affidavit filed by a Spring-land Films official] establishes more clearly I think is the interstate nature of the transaction at issue, that is, the making of this and distribution of this film. Which I think even without the affidavit, Judge, the result from our perspective should be the same, that is, that this is plainly an interstate commerce transaction no matter how one articulates the test. Whether it be an [Citizens Bank v.] Alafabco [, 539 U.S. 52 (2003),] type test of substantially affect[ing] interstate commerce or whether it be a test of plaintiff — excuse me — plaintiff now argues that you have to look to see whether the main or primary purpose of the transaction was intrastate or interstate.”
Thus, unlike the appellant in Kingvision, the petitioners did argue to the trial court that their case met the entirety of the relevant test, and they accordingly preserved their argument for appeal.
IV.
The petitioners have established that the primary purpose of the transaction between Springland Films and Martin was interstate commerce, specifically, to provide for Martin’s appearance in a film that might be used “without restriction in any media throughout the universe.” Because the purpose of that transaction was interstate commerce, the Commerce Clause of the United States Constitution precludes the courts of this State from applying § 10-2B-15.02(a) to prevent the petitioners from enforcing the consent agreement. Because the petitioners have a clear, legal right to the relief they seek — an order directing the Jefferson Circuit Court to vacate its order holding the consent agreement void and unenforceable — their petition for the writ of mandamus is granted. The trial court is directed to vacate its April 26, 2007, order and to conduct further proceedings consistent with this opinion.
*516 PETITION GRANTED; WRIT ISSUED.
COBB, C.J., and LYONS and STUART, JJ., concur.
MURDOCK, J., concurs specially.

. In all his dealings with Martin, Schulman identified himself as "Todd Lewis” and the company he was working for as Springland Films.

. Cohen was not initially included in the motion to dismiss because he had not yet been served when it was filed. However, after being served, Cohen filed a motion adopting and joining in the previously filed motion to dismiss.

. Section 10-2B-15.02(a) provides, in pertinent part:
"All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement

. Although this Court is not bound by the label parties may attach to a document, the fact that the contract at the center of this dispute was prominently labeled "Standard Consent Agreement” further supports our conclusion that obtaining Martin’s consent was an integral part of the transaction, which was not a transaction characterized by the simple exchange of money for Martin's services.